# Exhibit B

# FREEDOM COURT REPORTING

## Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF TENNESSEE
 2              COLUMBIA DIVISION
 3
 4
      ANTHONY E. GOOCH,           )
 5                                )
              Plaintiff,          )
 6    vs.                         ) CASE NO.
                                  ) 1:07-0016
 7    LIFE INVESTORS INSURANCE COMPANY OF)
      AMERICA, et al.,            )
 8                                )
              Defendants.         )
 9                                )
10
11
12    VIDEOTAPED DEPOSITION OF
13    ANTHONY E. GOOCH
14    Taken on Behalf of the Plaintiff
15    June 13, 2007
```

## Page 2

```
APPEARANCES:
For the Plaintiff:
    THOMAS O. SINCLAIR
    Campbell, Waller & Poer
    2100-A Southbridge Parkway, Suite 450
    Birmingham, Alabama 35209
    205.803.0051
    tsinclair@cwp-law.com

For the Defendants:
    MARKHAM R. LEVENTHAL
    Jorden Burt
    777 Brickell Avenue, Suite 500
    Miami, Florida 33131-2803
    305.371.2600
    ml@jordenusa.com

    GERALD LAX
    Inhouse Counsel AEGON USA

Also Present: Robert Jongema, Videographer
```

## Page 3

```
                    INDEX
WITNESS: ANTHONY E. GOOCH
            INDEX OF EXAMINATIONS
                                Page/Line
By Mr. Sinclair .................. 6    6
By Mr. Leventhal ................ 69   19
By Mr. Sinclair ................ 218    5
By Mr. Leventhal ............... 227    9
            INDEX OF EXHIBITS
                                Page/Line
No. 1  ...........................  7   13
No. 2  ...........................  11   2
No. 3  ...........................  47  19
No. 4  ...........................  69  25
No. 5  ...........................  83   1
No. 6  ........................... 121   3
No. 7  ........................... 123  11
No. 8  ........................... 157   4
No. 9  ........................... 169   7
No. 10 ........................... 181  17
No. 11 ........................... 189   9
No. 12 ........................... 199   3
```

## Page 4

```
         The videotaped deposition of
ANTHONY E. GOOCH, taken on behalf of the
Plaintiff, on the 13th day of June, 2007, in the
conference room of the Spring Hill Best Western,
104 Kedron Parkway, Spring Hill, Tennessee, for
all purposes under the Federal Rules of Civil
Procedure.
         The formalities as to notice,
caption, certificate, et cetera, are waived. All
objections, except as to the form of the
questions, are reserved to the hearing.
         It is agreed that Elisabeth A.
Miller, being a Notary Public and Court Reporter
for the State of Tennessee, may swear the witness,
and that the reading and signing of the completed
deposition by the witness are reserved.

                    * * *
```

1 (Pages 1 to 4)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 29

1  A.  Yes, they said I had a very high
2  percentage of successful treatment.
3  Q.  And were they ultimately successful in
4  treating those tumors?
5  A.  In -- those particular tumors, yes.
6  Q.  Okay. All right. Now, that wasn't the
7  last time you fought with a tumor, was it?
8  A.  Correct.
9  Q.  Okay. I need you, if you can, to run me
10 through where you've had tumors in your body. Can
11 you tell us that?
12 A.  I certainly can. I remember every one of
13 them, something that you -- you never forget.
14      During the end of the treatment for my
15 large cell and small cell non-Hodgkin's lymphoma,
16 they discovered I had involvement -- cancer
17 involvement in my bone marrow. I was then sent to
18 Vanderbilt Hospital --
19 Q.  Is that here in Tennessee?
20 A.  Yes, sir, it's in Nashville. And at that
21 point, I was accepted into the transplant program
22 to do an autologous stem cell transplant, and that
23 means I donated my own cells.
24 Q.  Okay.
25 A.  Which eliminated the possibility of me

Page 30

1  running into a problem getting cells from someone
2  else and having to take antirejection drugs.
3      Subsequently they removed me from the
4  program because they felt that it would not be
5  successful.
6  Q.  What -- I'm sorry. What do you mean they
7  removed you from the program at Vanderbilt -- is
8  this -- are we still at Vanderbilt?
9  A.  Yes.
10 Q.  And when was this?
11 A.  I want to say it was in, like, May of --
12 April/May of 2001.
13 Q.  Okay. That was the next set of -- of --
14 that was the next set of lesions or -- or tumors
15 that you had?
16 A.  That's correct.
17 Q.  Okay. So the tumors in '99 were resolved
18 through chemo?
19 A.  That's correct.
20 Q.  All right. Well, let me ask you, did you
21 file a claim with the defendants at that point?
22 A.  Yes, we did.
23 Q.  And did you have any problems with them
24 paying?
25 A.  None whatsoever.

Page 31

1  Q.  Did you have -- did you have medical
2  coverage at that point?
3  A.  Yes, I did.
4  Q.  Who did you have medical coverage with?
5  A.  It was through BlueCross -- I want to say
6  it was from where I worked and as well as I was
7  covered with my wife's policy at the same time
8  where she was employed as well.
9  Q.  Did you -- did you have to send the
10 defendants any EOBs or explanation of benefit
11 forms from BlueCross to receive benefits?
12 A.  No, sir.
13 Q.  And did they pay you the actual charges on
14 the doctors' bills that you sent them?
15 A.  Yes.
16      MR. LEVENTHAL: Object to the form.
17      Go ahead.
18 BY MR. SINCLAIR:
19 Q.  When you sent them the doctors' bills, did
20 they pay the amount stated on the doctors' bill?
21 A.  Yes, they did.
22 Q.  Any problem with them up until the second
23 set of tumors showed up?
24 A.  No, no problem. Normally we would file
25 the statements from the doctor, and within two to

Page 32

1  three weeks, I would get a check.
2  Q.  In May of 2001, you indicated that -- I
3  believe you said that your doctors told you your
4  bone marrow was involved?
5  A.  It was actually earlier in the spring, and
6  they had set me up at Vanderbilt, and it was April
7  or May that I went up there. At that point, I
8  received another port in my right chest, which was
9  an open port.
10 Q.  What -- what is a port?
11 A.  A port is an access point. I have one in
12 my left chest now. It's an access point where
13 they don't have to stick you in the arm or the
14 back of your hand. They can take the needle and
15 stick it right into the port, and you can receive
16 your chemo; they can do your blood analysis,
17 various things so that they don't have to go back
18 sticking you in the arm and --
19 Q.  You're talking about a port just like on a
20 computer?
21 A.  Pretty much, yeah.
22 Q.  Okay.
23 A.  They use a very small fishhook looking
24 needle that just snaps into the -- into the port.
25 Now, the one that I had at that time -- I had the

8 (Pages 29 to 32)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 37

1   2002.
2   Q.   Okay.
3   A.   I was in a wheelchair for about eight or
4   ten weeks after that. It took me some time to get
5   over it. After that, I thought I was doing great,
6   had a PET scan. They discovered tumors in my
7   lungs and began treating me for that.
8   Q.   In both lungs?
9   A.   That's correct.
10  Q.   Well, let me ask you, as far as the -- I'm
11  trying to group these by year.
12       But as far as the 2001 bone marrow cancer
13  treatments, did you submit claims to the
14  defendants?
15  A.   Yes, I did.
16  Q.   Did you have any problem with the claims
17  processing at that point?
18  A.   None whatsoever. There was a ceiling on
19  that, and they explained it to me, and I accepted
20  that.
21  Q.   What -- what do you mean they explained it
22  to you?
23  A.   When we called them in reference to that,
24  whether the coverage would be -- how the coverage
25  would work, the individual that we spoke with

Page 38

1   indicated that -- and I think it was a $35,000
2   ceiling. And that was the rules and the
3   regulations, and I -- okay, I'm -- I understood
4   that.
5   Q.   Is that your understanding from looking at
6   the policy?
7   A.   Yes.
8   Q.   Okay.
9   A.   I had -- this had been explained to me
10  that there were several procedures that had
11  ceilings on them, and I understood that going in.
12  Q.   Do you have any problem with that
13  particular provision of the policy?
14  A.   None whatsoever.
15  Q.   Okay. And that was something you agreed
16  to when you entered into this contract?
17  A.   That's correct.
18  Q.   Okay. And you'll live by that?
19  A.   Yes, sir.
20  Q.   Now, let me ask you, when you went and
21  filed your claims related to the 2001 bone marrow
22  treatments, did the defendants ask you for
23  statements from your medical care provider --
24  medical coverage provider?
25  A.   No. All we submitted was the doctors'

Page 39

1   itemized statements.
2   Q.   And did they pay the full amount reflected
3   on those itemized statements?
4   A.   Yes.
5   Q.   Subject to those caps you pointed out
6   earlier?
7   A.   Yes, sir, they did.
8   Q.   Okay. No problem with them up to that
9   point?
10  A.   No, sir.
11  Q.   As a matter of fact, under this policy, do
12  they give you incidental charges as well?
13  A.   There were some incidental charges that
14  were covered and some that weren't. Some of them
15  have a -- an annual cap, again, which I do
16  understand, and I accepted that.
17  Q.   Okay. Let's -- let's go ahead and move on
18  to the 2002 fighting the dragon, I guess. You
19  had -- you had tumors in your lungs diagnosed in
20  2002?
21  A.   It was late 2002, early 2003 maybe, they
22  diagnosed me with tumors in my lungs. I began
23  treatment for that. And I want to say it was at
24  that time I began receiving Rituxan, which is a
25  new -- at that time was a brand-new cancer drug.

Page 40

1   Q.   Okay. And -- and if you can -- I mean,
2   the jury is not going to know what Rituxan is or
3   what it does, and I know you're not a doctor. But
4   if you can tell them what your understanding is
5   since you're taking it. What is Rituxan?
6   A.   I was -- it was explained to me that it is
7   gene cell therapy. It was the -- at that time, it
8   was the leading edge -- and still is. It's even
9   more widely accepted now. At that time, it was at
10  the leading edge of the technology they were
11  using. At that time, the doctor told me I was the
12  second individual in the state of Alabama to get
13  it. It had already been approved a few days prior
14  to that for use.
15  Q.   This Rituxan, is it a form of chemotherapy
16  or is it --
17  A.   Yes.
18  Q.   Okay. All right. Is it a pretty
19  expensive treatment?
20  A.   Very expensive.
21  Q.   You have seen the doctors' bills?
22  A.   Yes.
23  Q.   Do you recall generally how much of one
24  treatment -- well, what is a treatment in your
25  terms?

10 (Pages 37 to 40)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 41

1  A.   It would take approximately seven hours
2  for me to get this treatment. The first treatment
3  you get is really bad. They -- the medical
4  profession refers to it as shake and bake. You
5  get an extremely high fever, and every muscle in
6  your body begins to quiver and contract. And I
7  haven't been that sore in my entire life after I
8  had that first treatment, and I did get all of the
9  symptoms that they said possible to get, and I did
10 get them.
11      But after the first treatment, it didn't
12 occur again, and they said that was again normal.
13      And you had asked -- the treatment at that
14 point was around $6,000, give or take a couple
15 hundred dollars. And I -- I want to say 6400, but
16 I can't swear to that.
17 Q.   Okay. When you sent the bill for Rituxan
18 in to the defendants, did you send the doctor's
19 statement, or did you send the statement for
20 BlueCross?
21 A.   We sent in the doctor's itemized
22 statement.
23 Q.   Okay. And did they pay the full amount of
24 that Rituxan treatment?
25 A.   Yes, they did. There were some subsequent

Page 42

1  items that were not covered, which I understood
2  that from the past dealings, and -- but they did
3  pay 100 percent on the Rituxan treatment itself.
4  Q.   And when you say 100 percent, you're
5  referring to what bill?
6  A.   The -- the -- the bills -- the itemized
7  bill that we received from the doctor.
8  Q.   Okay. All right. Tumors in lung in late
9  '02, early '03, another treatment of chemo. Did
10 they resolve?
11 A.   Yes, they began going down. Following
12 that, I did some -- I did a PET scan, and things
13 were doing well. The next PET scan came up, they
14 discovered tumors in my -- excuse me, in my upper
15 abdomen, and we continued with the chemo at that
16 time.
17 Q.   When was that that they discovered tumors
18 in your abdomen?
19 A.   I want to say maybe 2004.
20 Q.   And all the records you have relating to
21 the billing of that treatment, those are sitting
22 in front of you in Exhibit 2?
23 A.   That's correct.
24 Q.   Okay.
25 A.   I've looked through these, and from what

Page 43

1  I've seen, it appears as though they're all here.
2  Q.   Okay. Well -- all right. We had tumors
3  in the lung in late '02, early '03. Now they're
4  in the abdomen in '04. Are you undergoing chemo
5  this entire period of time between '02 and '04?
6  A.   Yes, I was getting breaks periodically. I
7  would get two, three, four months of chemo, then I
8  would get a break for a while.
9  Q.   Okay.
10 A.   Again, now, we have come another circle.
11 Christmas morning, which was a Monday -- Sunday my
12 wife and I had gone to church, and having had so
13 many tumors and being aware of cancer, I
14 constantly when I'm showering, I check myself all
15 over for any tumors or anything or any lumps that
16 I don't think should be there. I was fine.
17      Monday morning I got up, I had had a pain
18 in my right breast. At that point, I was taking a
19 shower, and I noticed a small lump just to the
20 left of my nipple, called the doctor on Tuesday,
21 went to see him on Thursday. At that point, the
22 lump had grown considerably larger to about the
23 size of half a lemon. At that point, they began
24 doing some tests.
25      The following weekend -- it seems that

Page 44

1  holidays are the times I have my problems. The
2  following weekend was New Year's. I had gotten up
3  on the 2nd of January and couldn't walk on my own,
4  couldn't breathe, and the doctor sent me to the
5  emergency room. And they discovered that my
6  kidneys had totally failed. I had complete renal
7  failure.
8  Q.   When was this?
9  A.   That was January 2 of 2007.
10 Q.   Okay. All right. Now, I want to make
11 sure, for the period between '02 and '04, did you
12 have tumors anywhere else besides the lung and
13 abdomen?
14 A.   No, sir.
15 Q.   Not -- okay. You're -- you're looking up
16 at the sky. Are you -- am I -- are you getting
17 tired because I can -- I can -- you're not --
18 you're not focused on me. Do you need to take a
19 break?
20 A.   I think right now I'm okay.
21 Q.   Okay.
22 A.   What I -- I roll my eyes up because I'm
23 trying to see where my brain is at, see if it's
24 functioning.
25 Q.   Okay. Between '02 and '04, have you told

11 (Pages 41 to 44)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 45

1  me about all the tumors and all the treatments
2  that you can recall at this time?
3  A.    To the best of my recollection, yes, sir.
4  Q.    Okay. Did you submit claims to the
5  defendants for this time period?
6  A.    Yes.
7  Q.    And did they pay you the amount reflected
8  on your doctor's bill or the amount reflected on
9  the amount BlueCross paid?
10 A.    They paid on the itemized doctor's bill,
11 the statement directly from the doctor.
12 Q.    And did they pay 100 percent of that
13 itemized doctor's statement?
14 A.    They -- they paid the -- the chemo, there
15 were a few shots that I get in there that there is
16 a ceiling on.
17 Q.    You know what, I see what you're saying.
18 You've -- you're saying that under the terms of
19 the policy, there's some things that don't get
20 paid?
21 A.    That's correct.
22 Q.    Okay. All right. So let me say it
23 another way. Let me not say 100 percent. Let me
24 say for the -- for example, the chemo treatment,
25 did they pay 100 percent of what the doctor's

Page 46

1  statement reflected the charges were?
2  A.    Yes, sir.
3        MR. LEVENTHAL: Objection.
4        Go ahead.
5        THE WITNESS: They did.
6  BY MR. SINCLAIR:
7  Q.    I'm sorry, what?
8  A.    Yes, sir, they did.
9        MR. SINCLAIR: Okay. Grounds?
10       MR. LEVENTHAL: Form of the question.
11 BY MR. SINCLAIR:
12 Q.    Okay. Did you have any problem with them
13 up until the end of '04?
14 A.    No.
15 Q.    Did -- did the defendants do anything to
16 reduce your benefits?
17 A.    No, sir.
18 Q.    Okay. Up until '04?
19 A.    That's correct.
20 Q.    Okay. Stepping into '05, '06 now, I hate
21 to ask this, but do we have more tumors in '05,
22 '06?
23 A.    Yes, sir.
24 Q.    Where else?
25 A.    I now have a tumor on each kidney. My

Page 47

1  left kidney is working at approximately 5 percent.
2  My right kidney is working at 100 percent. I have
3  four tumors across the top of my abdomen. I have
4  a 4 mill- -- a .4-millimeter tumor in my right
5  lung. And the lump from my right breast was
6  removed, and it was cancerous. So now I'm dealing
7  with breast cancer, which is not that common in
8  men, but it does happen.
9        Of course, I have the one tumor in my
10 right lung, which is going down, and the tumors on
11 my kidneys and the other tumors I will find out
12 next month how they're doing.
13 Q.    You're currently undergoing chemotherapy?
14 A.    Yes, sir, I am.
15 Q.    Okay. Are those treatments -- I mean --
16 let me do it this way. Let me show you what I'm
17 going to mark as Exhibit 3, which is his affidavit
18 that was submitted earlier to the defendants.
19       (Marked Exhibit No. 3.)
20 BY MR. SINCLAIR:
21 Q.    And ask you if you can identify that
22 document for us. Have you seen that before today?
23 A.    Yes, sir, I have.
24 Q.    Okay. Take a look through, flip back to
25 the last page, and tell me if that is, in fact,

Page 48

1  your signature on the last page?
2        MR. LEVENTHAL: Do you have a copy of
3  that?
4        MR. SINCLAIR: I do, but I marked it
5  up, and I -- I didn't bring an extra one. I tell
6  you what, we'll let him hand you his, and he can
7  look at this one. It's just got little
8  scratches on it where I -- you know what, that's
9  not that big of a -- here, you can take a look at
10 that.
11       THE WITNESS: Yes, it is. Getting
12 back to your question, yes, that is my signature.
13 BY MR. SINCLAIR:
14 Q.    Okay. Let me ask it again, because
15 playing the video for the jury, we have to chop it
16 up anyway, but I want to make sure that we -- we
17 don't have to do it for that question.
18 A.    Okay.
19 Q.    Take a look at what I've marked as
20 Exhibit 3. Do you recognize that document?
21 A.    Yes, sir, I do.
22 Q.    Okay. If you would, please tell the jury
23 what that document is.
24 A.    Let me make sure I read it, make sure I
25 know what it is.

12 (Pages 45 to 48)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 53

1  A.  Yes, I have.
2  Q.  Okay. Did you review it before you
3  purchased it?
4  A.  Yes, I did.
5  Q.  And in your review of this policy, you
6  understand that certain terms are within the
7  policy. I'm not asking — you're not a lawyer,
8  are you?
9  A.  No, sir.
10 Q.  Okay. I'm asking you for your
11 understanding as a layman of these terms. Okay?
12 A.  Uh-huh.
13 Q.  There's a term within that policy that
14 says they'll pay actual expenses. Did you see
15 that term?
16 A.  Yes.
17 Q.  Okay. And for certain things they'll pay
18 actual expenses, right?
19 A.  That's correct.
20 Q.  What's your understanding of what actual
21 expenses were, in your course of dealing with them
22 and your understanding as a layman?
23 A.  My understanding of it was at that point
24 and — and still is that whatever the doctor bills
25 you for, that's the actual charge.

Page 54

1  Q.  Well, I'm saying actual expenses. If —
2  A.  Well, the actual expense.
3  Q.  Okay. There's an actual charge provision
4  in there that talks about actual charges. Are you
5  telling me that — okay. I think you just got two
6  terms confused.
7  A.  That's very possible.
8  Q.  And — and we've been going 55 minutes.
9  A.  Okay.
10 Q.  Why don't we take a break. Okay?
11 A.  Okay.
12 Q.  Do you need — would it help you to close
13 your eyes for a few minutes and sit quietly?
14 A.  It probably would, just kind of relax.
15 Q.  Okay. What don't you — if you need —
16 I'm sure with one kidney — we'll take a break, go
17 off the record, if we can, you go take a break.
18 Okay?
19     THE VIDEOGRAPHER: We're going off
20 the record. The time is 9:54 a.m.
21     (Brief recess observed.)
22     THE VIDEOGRAPHER: We're back on the
23 record. The time is 10:07 a.m.
24 BY MR. SINCLAIR:
25 Q.  All right. Mr. Gooch, do you feel a

Page 55

1  little bit better?
2  A.  Yeah, I got to take a few moment's break
3  and —
4  Q.  Okay. You let us know if we have to take
5  a break again. Okay?
6  A.  Okay.
7  Q.  The last questions we were talking about,
8  what happened in 2006. Do you recall receiving
9  correspondence from the defendants in 2006?
10 A.  Yes.
11 Q.  Okay. Do you — well, let me just ask
12 you, do you recall what they — you obviously had
13 been submitting claims up through 2006, hadn't
14 you?
15 A.  That's correct.
16 Q.  Okay. When was the last course of
17 treatment you received that you submitted a claim
18 to the defendants for?
19 A.  In 2006? I'm trying to think. It was
20 after the — I had received a letter in May
21 explaining to me that they would have to have the
22 EOBs, that that's what they were going to pay
23 from.
24 Q.  What is an EOB?
25 A.  The explanation of benefits.

Page 56

1  Q.  From?
2  A.  BlueCross BlueShield, and as well as —
3  I'm covered under Medicare as well.
4  Q.  Okay.
5  A.  That's what they were going to pay from.
6  Q.  Let's — let's step back a minute so the
7  jury understands. Does this policy pay your
8  medical providers for your treatment?
9  A.  No, it pays me directly.
10 Q.  Okay. Is this policy, in your
11 understanding when you bought it, intended to pay
12 medical benefits?
13 A.  To me only, not — not to the doctor. It
14 was — my understanding was it was money that was
15 coming to me that would pay me for the expenses
16 that were incurred for my chemo and a few other
17 incidental expenses.
18 Q.  Okay. And were those expenses set at
19 different levels in your understanding and under
20 the policy?
21 A.  The chemo, the — he explained it to me —
22 this Jerry explained it to me it was 100 percent.
23 And subsequently, again, he also explained that
24 there were other items they paid that had a set
25 amount.

14 (Pages 53 to 56)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 57

1  Q.   Okay. And let's make sure the
2  jury under -- that I understand and the jury
3  understands what you mean when you keep saying 100
4  percent. What do you mean 100 percent? When you
5  say that, what do you mean?
6  A.   Well, my understanding at the time and the
7  subsequent claims that we started in '99, that
8  they would pay the actual charge that was coming
9  from the doctor. If the doctor's expense -- or
10 the doctor's chemo charge was 6,000, that was the
11 check I received, and it was like that all along,
12 never changed.
13 Q.   Up until when?
14 A.   Up until we had filed in -- several claims
15 in June. They paid the full rate at that point.
16 After June, beginning July 1, I believe it was of
17 206 -- or 2006, they were paying on the EOBs and
18 said they would do -- they would no longer pay
19 from the doctor's statement, just from the EOB of
20 the -- BlueCross BlueShield.
21 Q.   Okay. And let me ask you, the -- the
22 defendants have -- have said to the court that
23 what they did was just change the claims handling
24 process. Did they change the claims handling
25 process? Did they start requiring different

Page 58

1  proofs?
2  A.   Yes.
3  Q.   Okay. Did that subsequently have a
4  change -- or create a change to your benefits?
5  A.   Yes.
6  Q.   Okay. Tell me how this new process that
7  they put in place in 2006 changed the amount of
8  benefits. And if you can be specific, let's talk
9  about Rituxan, if we can. That's a drug you're
10 still getting, correct?
11 A.   That's correct.
12 Q.   And you submitted a claim in 2007 for
13 that?
14 A.   Yes, we have.
15 Q.   Okay. And have the defendants paid the
16 amount on your doctor's bill for that?
17 A.   The doctor's statement, no.
18 Q.   Okay. What did they pay?
19 A.   They paid from the EOB, the explanation of
20 benefits from the insurance company, which the
21 doctor had chosen -- they had made an offer
22 apparently, the way I understand it, and the
23 doctor was willing to give them a discount or take
24 a lesser amount.
25 Q.   Let -- and that's -- that's what I'm

Page 59

1  trying to understand. The EOBs -- let's say
2  BlueCross statements. BlueCross statements --
3  BlueCross pays less than the doctor bills --
4  A.   That's correct.
5  Q.   -- for your Rituxan --
6        MR. LEVENTHAL: Objection to the form
7  of the question.
8        Go ahead.
9  BY MR. SINCLAIR:
10 Q.   I'm sorry. Does BlueCross pay less to
11 your doctor for Rituxan treatments than your
12 doctor sends you a bill for?
13 A.   Yes.
14 Q.   Okay. Do you -- when you took out this
15 policy, when you sat down with Jerry and during
16 the first eight years you were submitting these
17 chemo treatments, was it ever your understanding
18 you had to have BlueCross statements submitted in
19 order to be paid from these defendants?
20 A.   No. As a matter of fact, we -- we
21 received a letter, I want to say it was November
22 of '99 or December, explaining -- because we had
23 called and asked, how do we apply for the
24 benefits. And they -- in the letter, it details
25 that we must send in an itemized statement from

Page 60

1  the doctor.
2  Q.   When you took out this policy, did Jerry
3  ask you if you had BlueCross BlueShield or some
4  medical coverage?
5  A.   No, he did not.
6  Q.   Did he say that the only way they would
7  issue this policy to you would be if you had
8  BlueCross or -- or Medicaid or something?
9  A.   No.
10 Q.   Okay. Was this policy in any way, shape,
11 or form, in your understanding, your conversation
12 with Jerry, ever intended to pay your doctors for
13 the treatments?
14 A.   No.
15 Q.   Okay. Was it ever intended to be a
16 supplemental medical coverage policy, in your
17 understanding?
18 A.   No.
19 Q.   Okay. When we talk about the amount
20 BlueCross pays, you know this, how do you know
21 that BlueCross pays less for Rituxan than your
22 doctor sends you a charge for?
23 A.   The EOB, which is explanation of benefits,
24 lists the price, the cost that the doctor has
25 billed BlueCross BlueShield or the -- the medical

15 (Pages 57 to 60)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 61

1  provider, the insurance provider. And then they
2  have a column there that says, your doctor has
3  agreed to accept this amount in payment in full.
4  And that amount is always lower than what the
5  doctor actually charged.
6  Q.   So it's your understanding that BlueCross
7  gets a discount?
8  A.   That's correct.
9  Q.   Okay. Let me back up. You mentioned
10 before that you had conversations with some of the
11 defendants' employees?
12 A.   That's correct.
13 Q.   If you can, let's -- let's go back to the
14 first conversation you had with the defendants'
15 employees. Was that in '99?
16 A.   The very first contact we made, yes, was
17 in '99.
18 Q.   Okay.
19 A.   Because at that point I had been diagnosed
20 with cancer, and we just wanted to find out what
21 the procedures were, what we had to do to file a
22 claim, how we had to do it, just getting a
23 guideline.
24 Q.   At that point, did they tell you they
25 would only pay you whatever your medical care

Page 62

1  provider paid your doctor?
2  A.   No.
3  Q.   Did they tell you they would pay whatever
4  your doctor was charging on his bill?
5  A.   My -- yes. To the best of my
6  recollection, they said you send in the itemized
7  doctor's statement and that's what we will pay
8  from.
9  Q.   And did you subsequently receive an
10 instruction letter from them on the same thing?
11 A.   Yes, we did.
12 Q.   Okay. When was the next conversation that
13 you had with the defendants' employees that you
14 can recall?
15 A.   We had a few conversations over the period
16 of time, various coverages, especially when I went
17 to my -- for my transplant. And we called them to
18 find out -- because we had gotten a letter telling
19 us that there was a ceiling, that there was a
20 maximum they would pay on that procedure, and we
21 called to find out what we had to do, what the
22 maximum amount was, and how to go about it. And
23 that's what -- we followed their instructions.
24 Q.   Did -- did you actually talk to the
25 defendants' employees about the amount that they

Page 63

1  were willing to pay for stem cell transplants?
2  A.   Yes, we did. And, again, it was one of
3  those things that I had been explained by Jerry
4  that there were some ceilings or maximum limits,
5  which, again, I accepted that, and I understood
6  that, and they explained to us that, hey, this is
7  one of those items that there is a maximum benefit
8  that we will pay. And I understood that at the
9  time and had no objection to it.
10 Q.   When -- when you talked to the defendants'
11 employees before going to the stem cell treatment
12 at Vandy, that's where you had the stem cell
13 treatment, right?
14 A.   That's correct.
15 Q.   Okay. When you talked to them, did they
16 tell you that they were still issuing and selling
17 these policies?
18 A.   At one point, one of the ladies I spoke
19 with informed me that they no longer sold that
20 type of policy because folks were living much
21 longer due to the new medical advancements, and
22 they no longer sold that policy because it cost
23 too much money --
24 Q.   What cost --
25 A.   -- from the company. The company had to

Page 64

1  pay out a lot of money because -- the policy, the
2  way it was configured, the way it was paid out.
3  Apparently when that policy was written, when you
4  had cancer, it was a death sentence.
5       And at that point, I believe that's when
6  they changed the policy. I've never seen a policy
7  following that, so I just went by what the -- the
8  individual told me.
9  Q.   Okay. And this is somebody you contacted
10 at the defendants' phone numbers that they gave --
11 A.   That is correct.
12 Q.   Okay. After you received the letter in
13 around May of 2006 informing you that the benefits
14 were going to be reduced, did you have a
15 conversation with the defendants' employees?
16 A.   Yes, I did.
17 Q.   Okay. Please tell me about the first
18 conversation you had with the defendants'
19 employees.
20 A.   Well, I had spoken to them and objected to
21 what this meant to me. I said, this is going to
22 cut my benefits. And we spoke about that, and I
23 told the lady, I said, I don't understand how I
24 have a contract, an open contract and an open
25 claim. She said, oh, well, if you have an open

16 (Pages 61 to 64)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 65

1 claim, this letter is not going to affect you, as
2 long as you have an open claim.
3 But once you have been declared in
4 remission or whatever and you no longer have an
5 open claim, the next claim you make will be
6 on the -- the reduced list paid on the EOB. But
7 as long as you have an open claim, it will still
8 continue like it always has.
9 Q. Okay.
10 A. And I -- I never got the lady's name. I
11 wish I had. I just didn't do that.
12 Q. Okay. Did she express regret at the
13 change?
14 MR. LEVENTHAL: Objection.
15 THE WITNESS: Not openly.
16 MR. LEVENTHAL: Go ahead.
17 BY MR. SINCLAIR:
18 Q. What do you mean not openly?
19 A. It just felt -- I kind of got the feeling
20 that she was trying to explain to me that my
21 benefits weren't going to change, that others who
22 haven't filed a claim as yet, theirs would change
23 but mine would not because of the fact I already
24 had an open claim.
25 Q. Did your benefits subsequently change?

Page 66

1 A. Yes, they did.
2 Q. Okay. Let me ask you, when did you stop
3 working as a mechanic in Pulaski?
4 A. It was late July, early August of '99.
5 Q. Have you worked for pay since?
6 A. No.
7 Q. Do you occasionally do volunteer work when
8 you can?
9 A. Yes, I do.
10 Q. Okay. Do you have any compensation --
11 paid compensation for work that you've received
12 since you've stopped working in Pulaski?
13 A. No.
14 Q. Okay. Do you -- this policy, is this your
15 personal source of income at this point?
16 A. Yes, it is. I -- of course, I'm on
17 disability, SSI, and I get approximately one-third
18 maybe of what I used to make, and it doesn't cover
19 my bills.
20 Q. Okay. Did you in conversation with the
21 defendants' employees ever tell them that you
22 wanted them to continue paying 100 percent of the
23 doctors' bills?
24 A. Yes.
25 Q. Did you send them a letter stating such?

Page 67

1 A. We have -- to my knowledge, every time
2 there was a claim following this letter, we had
3 sent along the EOB along with the doctor's
4 statement. And most of the time I believe my wife
5 would put on there that we were -- we protested or
6 was disappointed or did not like or agree with the
7 reduction.
8 Q. When you were talking to the defendants'
9 employees those first two conversations you recall
10 there, did you tell them you wanted them to keep
11 paying 100 percent of the doctor's statement?
12 A. Yes, I told them that. I said, I'm not
13 giving anybody a discount; I didn't contract for a
14 discount. And the lady explained to me that this
15 is across the board, that everybody is being done
16 this way, and it is a change in the policy.
17 Q. Did she tell you everybody who had a
18 Life Investors cancer only policy was getting done
19 this way?
20 A. She didn't really -- she inferred that.
21 Q. Okay.
22 A. She didn't actually say that, but she
23 inferred that everyone in this situation has
24 received this letter and will be -- that's how
25 they'll be paid, so ...

Page 68

1 Q. Do you -- well, and let me ask you, do you
2 feel as though -- I had asked you previously for
3 different time periods if you felt like the
4 defendants had lived up to their promises. Do you
5 remember me asking those questions?
6 A. Yes.
7 Q. As you sit here today, do you feel like
8 they've lived up to the promises they made you
9 when you bought that policy?
10 A. Not at this point, no.
11 Q. Okay. Are you aware that this is, in
12 fact, filed as a class action?
13 A. Yes, sir, I am.
14 Q. Okay. Do you understand that you sit here
15 today for potentially thousands of other people?
16 A. Yes, sir, I understand that.
17 Q. Are you willing to do that?
18 A. Yes, sir.
19 Q. Why?
20 A. I think it's unfair. When I bought the
21 policy, my understanding was they would pay me 100
22 percent. That's the way it was explained to me.
23 And over the years, I've always thought that when
24 you make an explanation, you make an agreement,
25 it's your word, and you should stand by it.

17 (Pages 65 to 68)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**