# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION
CIVIL ACTION NO. 3:10-CV-0014

TRANSAMERICA LIFE INSURANCE
COMPANY,

        Plaintiff and
        Counterclaim Defendant,

v.

ARCHIE E. MOORE, Individually and as
Co-Executor of the Estate of Nancy Moore,
and DONNA JANE MOORE as Co-Executor
of the Estate of Nancy Moore,

        Defendants and
        Counterclaim Plaintiffs.

## DECLARATION OF JOHN A. HARTNEDY

Pursuant to 28 U.S.C. §1746, the undersigned, John A. Hartnedy, states the following:

1.    I reside at 1786 N. Central Avenue, Flagler Beach, Florida. I am over the age of 18.

**Background**

2.    I am a life and health insurance actuary. I have been a fellow in the Society of Actuaries since 1970. I have been a member of the American Academy of Actuaries since 1969.

3.    During my professional career -- spanning over 35 years − I have held various positions with numerous life and health insurance companies. I have held the title of Chief Actuary with four insurance companies, have been President of one, Chief Financial Officer of another, and Chief Operating Officer of yet another.

4.      My responsibilities in these positions included, among other responsibilities, product development, setting life and health insurance rates, monitoring life and health insurance loss ratios, and supervising personnel in nearly every department of a life or health insurance company, including actuarial, claims, underwriting, marketing, information systems, and accounting. I also have extensive experience working and interacting with state legislatures and insurance regulators.

5.      From 1996 until April 1, 2005, I was the Chief Deputy Commissioner for the Arkansas Department of Insurance. My responsibilities in this position included reviewing product filings, reviewing rate filings (including rate increases), supervising market conduct reviews and investigations, and administrative responsibilities for the Department.

6.      In May 2003, I was appointed by President George W. Bush as one of three members of the Department of Defense Board of Actuaries. The Board of Actuaries approves methods and assumptions used in the valuation of the Military Retirement System. I served in that role until 2009.

7.      After my retirement I have remained active in professional and personal pursuits. My professional pursuits have included the DoD Board of Actuaries and assisting the Government of India in developing regulations intended to regulate health insurance companies. My personal pursuits have included being ordained as a Deacon in the Catholic Church.

8.      From 1988 until 1994, I was the Chief Actuary for Golden Rule Insurance Company in Indianapolis, Indiana. Golden Rule's primary market was the development and sale of health insurance to individuals and families. As Chief Actuary for Golden

Rule, I had significant, first-hand involvement in all areas of a health insurance company including, product development, rate-setting, and monitoring claims.

9.    In 1994 I voluntarily left my position as Chief Actuary of Golden Rule Insurance Company, to accept a position as Chief Operating Officer of the Supplemental Insurance Division of Aegon with direct responsibility of Aegon's cancer insurance policies. My office was located in Little Rock, Arkansas.

**Employment with Aegon**

10.    I was hired as Chief Operating Officer of Aegon by Jack Dykhouse. I served in that role until 1996.

11.    At the time I was hired, Jack Dykhouse informed me that the cancer polices in my Division were declining in profitability and that Aegon was reviewing its options with respect to that Division. Those options included either returning the division to profitability or shutting it down. At the time I was hired, Chuck Arrington was running the Division. After I was hired, Chuck Arrington continued to manage all of the marketing operations for the Division. I assumed responsibility for the actuarial, accounting, underwriting, and information systems operations.

12.    During my tenure as Chief Operating Officer of the Division, Gary Oline was my actuary responsible for rate filings concerning cancer insurance policies. J. Brandon was responsible for claims. Both of these individuals reported directly to me.

13.    When I began my employment at Aegon, the company was still actively engaged in the sale of cancer insurance policies with unlimited chemotherapy and radiation benefits. I quickly became aware that the senior officers of Aegon were very concerned about the profitability of the cancer policies with unlimited benefits. At the time, our Division included policies issued by Equity National Life Insurance Company

and Life Investors Insurance Company. Many of the cancer policies developed, administered, and sold during my tenure included unlimited chemotherapy and radiation benefits.

**"Actual Charges"**

14. I am familiar with the cancer insurance policies that pay benefits to the insured based on the "actual charges" of chemotherapy and radiation treatments. Many of the policies sold by our Division included this language. The term "actual charges" was not defined in the "Definitions" section of the policies.

15. During my tenure at Aegon, "actual charges" meant the original amount billed by the doctor, hospital, or medical provider before any reductions to the billed amount. Rates on the cancer policies were set on this basis and claims were adjusted with this meaning of the term "actual charges." The term "actual charges" did not mean the discounted amount paid by health insurance, Medicare, or Medicaid. "Actual charges" also did not mean any lesser amount that a doctor, hospital, or medical provider might agree to accept as payment for their bill.

16. I have reviewed a letter dated November 10, 1997 sent by Sandra D'Orazio, Assistant Vice President-Compliance Officer of the Aegon Supplemental Insurance Division, to the Oklahoma Department of Insurance. In that letter Ms. D'Orazio states:

> It is the company's practice to pay the actual charge billed to the insured for those items identified in the policy as being covered for actual charges. We do not pursue information regarding discounts when determining benefits.

17. This position is consistent with the policy and practice of our Division between 1994 and 1996. We did not ask insureds to identify any applicable health insurance coverage to determine any benefit we were obligated to pay under a cancer

4

insurance policy. At no time did we coordinate benefits between a cancer insurance policy and any health insurance plan, private or governmental.

18.     Our Division operated on the basis that the common meaning of "actual charges" meant that those benefits under the cancer insurance policies were based on the original amount of the doctor, hospital, or medical provider bill before any discounts.

19.     I recall attending the convention of our sales force while I was employed by Aegon. In these discussions, it was clear that the policies were sold with the understanding that "actual charges" meant the original amount a doctor, hospital, or other medical provider billed for their services. I discussed with the sales force that if Aegon continued to sell cancer policies providing unlimited benefits for the "actual charges" of chemotherapy and radiation treatments, higher and more frequent rate increases would be necessary. Almost to the man, the sales force expressed the desire to continue selling cancer policies paying unlimited "actual charges" benefits for chemotherapy and radiation.

20.     In November 1997, I was the Chief Deputy Commissioner of the Arkansas Department of Insurance. At that time I was asked by Dan Keating, an Actuary for the Oklahoma Department of Insurance, what "actual charges" meant as that term was used in cancer policies. In a memorandum to Dan Keating dated November 5, 1997, I stated the following:

> In my own experience, and in talking to others, the common understanding of "Actual Charges" is whatever the doctor has billed and not, in fact, what a managed care organization may choose to pay. Unless there is a specific definition in the policy that defines "Actual Charges" different than what I just described, it would seem unreasonable to not follow common usage.

\* \* \*

Therefore, based on your description that a company is using an undefined "Actual Charges" as a basis for paying something less than what the provider has billed, namely whatever another insurance company's EOB identifies as the managed care discounted fee, we would not find acceptable in Arkansas.

21.     The experience I referred to in my memorandum to Dan Keating included my experience as Chief Operating Officer at Aegon with responsibility over its cancer policies.

22.     I also advised Dan Keating that Arkansas would consider any attempt to reduce "actual charges" benefits to the discounted amount to be an unlawful attempt to "coordinate" benefits.

**Rates on Cancer Policies**

23.     When I assumed responsibility for Aegon's cancer insurance policies, it was clear that rate increases were necessary.

24.     It was my opinion that the profitability of Aegon's block of cancer policies could be maintained and improved if the block was monitored appropriately and if rate increases were implemented when experience called for a rate increase.

25.     Most states allow specific loss ratios for cancer policies.  If a company's experience exceeds this loss ratio, rate increases are usually allowed by state regulators.

26.     During my tenure at Aegon, I instructed our actuaries to seek approval for significant rate increases on our cancer policies.  On some policies, increases of 50% or more were sought and approved by insurance regulators.  I observed that these rate increases had a negligible impact on persistency; meaning that the rate increase did not cause many policyowners to cancel the policy.  These policies are "peace of mind" policies, and their cost is not significant when compared to major medical insurance.

27.     Some states limit the amount of a rate increase which can be requested. In those states, it is particularly important to keep up with needed rate increases. If you do not, it may become impossible to institute rate increases which are large enough to return the policy or block to profitability.

28.     When I left Aegon in 1996, profitability on the block of cancer policies had improved.

29.     I have reviewed a summary of the rate increases sought from the Kentucky Department of Insurance on the policy form sold to Mrs. Moore. In my opinion, and based on my experience at Aegon, there were years during which Aegon could have sought rate increases on the policy form but did not. In a closed block of policies like these, without necessary rate increases the only other way to return the block to profitability is to reduce claims payments.

30.     If rates cannot be raised enough to generate sufficient premium to return a policy form or block of policies to profitability, the insurer must bear the loss.

### The 2006 Change in Meaning of "Actual Charges"

31.     I have reviewed the Memorandum from Connie Whitlock dated July 22, 2005.

32.     This memoranda changes the meaning of the term "actual charges" from the meaning assigned during the time when I was employed at Aegon. During my tenure, it was accepted by the Supplemental Insurance Division at Aegon that "actual charges" meant the original amount of the bill of the doctor, hospital, or other medical provider generated as a result providing treatment to the insured. Any discount obtained by a third party did not reduce the benefit paid. Changing the claim procedure to collect Explanation of Benefits forms leading to payment of policy benefits based on

7

the lower discounted amount is contrary to the practice when I was employed at Aegon and, in my opinion, amounts to a change in the meaning of the term "actual charges" in the policy.

33.     From my experience in the health insurance industry and during my tenure at Aegon, it was common knowledge that private health insurance companies had negotiated discounts with doctors, hospitals, and other medical providers. It was also known that governmental programs may pay an amount even lower than a private health insurer may agree to pay for a certain procedure or service. Even with this knowledge, "actual charges" meant the amount that a doctor, hospital, or other medical provider billed for the procedure before any discounts.

34.     The cancer policies state that they insure for "loss incurred." An insured incurs a "loss" when he or she receives treatment from his or her doctor, hospital, or other medical provider.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 27, 2011.

John Hartnedy

John Hartnedy

8